**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RASHAD SANFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 17 C 04213 |
| | ) |
| COMCAST CABLE | ) Judge Edmond E. Chang |
| COMMUNICATIONS | ) |
| MANAGEMENT, LLC | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Rashad Sanford worked at Comcast Cable Communications Management as a call center supervisor from September 2014 until he was fired in October 2016. R. 71, Pl.'s Resp. DSOF ¶ 33.[1] Sanford sued Comcast under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, alleging that he was fired in retaliation for refusing to improperly discriminate against four of his supervisees. *See generally*, R. 1, Compl. Comcast has now moved for summary judgment. *See* R. 62, Mot. Summ.

---

[1] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Citations to the Plaintiff's Response to the Defendant's Rule 56.1 statement of material facts, R. 71, are intended to incorporate both Comcast's original fact statement, as well as Sanford's response to it. Where Sanford's response did not directly rebut Comcast's statement of a fact, or failed to point to evidence to rebut it, the Court has considered the fact uncontested.

The Court has jurisdiction over this claim under 28 U.S.C. § 1331.

J.; R. 63, DSOF; R. 64, Def.'s Br. For the reasons explained below, Comcast's motion is granted.

## I. Background

In deciding the Defendant's motion for summary judgment, the Court views the evidence in the light most favorable to the Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Sanford began his job as a call center supervisor at Comcast in September 2014. Pl.'s Resp. DSOF ¶ 33. In that role, Sanford oversaw employees, referred to by Comcast as Customer Account Executives (CAEs), who "answer[ed] calls from Comcast customers regarding billing inquiries and technical issues." *Id*. ¶¶ 3-4. Supervisors' responsibilities included "providing ongoing performance feedback" to CAEs, "developing [CAEs'] personal performance plans," monitoring CAEs' calls and coaching them on their performance, and "recommending and administering discipline when appropriate." *Id*. ¶ 4; *see also* R. 63-4, Def.'s Exh. D, Job Descript. for CAE Supers. Supervisors reported to managers; in turn, managers at Sanford's Comcast call center, located in Tinley Park, Illinois, report to Customer Care Director Andre Brown. Pl.'s Resp. DSOF ¶¶ 5-6. Since 2013, Denise Lugo has been the human resources director at the call center. *Id*. ¶ 7.

While Sanford was employed at the call center, all center supervisors received mid-year and year-end performance evaluations from their managers. Pl.'s Resp. DSOF ¶ 14. Each evaluation included assessments of qualitative leadership skills, *id*. ¶¶ 16, 24-26, as well as information on quantitative performance indicators, which measured various aspects of CAEs' calls, *id*. ¶¶ 15, 17-21. The call indicators reflected

back on supervisors' performance, because supervisors were responsible for "identify[ing] and coach[ing CAEs'] specific behaviors" to improve the performance indicators. *Id*. ¶¶ 22-23. Supervisors were also evaluated by the CAEs they supervised via surveys that Comcast refers to as the "Credo Speak" and "Credo Pulse." *Id*. ¶¶ 27-29. The two surveys were similar in terms of content; the Credo Pulse survey was a shorter version of the Credo Speak survey. *Id*. ¶ 30.

When Sanford first began working at Comcast, he was trained and supervised by manager Hilda Toscano. Pl.'s Resp. DSOF ¶¶ 36-39. Toscano wrote both of Sanford's 2015 evaluations. *Id*. ¶ 40. In the mid-year evaluation, she noted several problems with Sanford's supervision of his team, including that he did not complete evaluations as required, did not approve payroll timely, managed attendance poorly, failed to complete trainings on time, and did not take initiative on corrective actions for his team of CAEs. *Id*. ¶ 41; R. 63-8, Def.'s Exh. H, 2015 Perform. Eval. at 12-13; R. 63-12, Def.'s Exh. L, Toscano Decl. ¶¶ 1-5. On the year-end evaluation, Toscano rated Sanford as "unacceptable" or "needs improvement" in several categories. Pl.'s Resp. DSOF ¶¶ 42-43. She noted that Sanford "did not do well" managing his team's trainings throughout the year, and that "[h]e [was] not providing feedback to the agent in a timely manner or following up with the customer if applicable." *Id*.; Def.'s Exh. H, 2015 Perform. Eval. at 3, 12. In 2015, Sanford also received a Credo Speak score of 58.5% from his CAEs. Pl.'s Resp. DSOF ¶ 44. Comcast characterizes 58.5% as a "poor score." *Id*. At the end of the year, in December 2015, Sanford was

3

transferred to work under manager Robert Signore. Pl.'s Resp. DSOF ¶ 45; R. 75, Def.'s Resp. PSOF ¶ 21.

Sanford's performance problems continued in 2016. The 2016 Credo Pulse survey was administered in January or early February. Pl.'s Resp. DSOF ¶¶ 31, 47; Def.'s Resp. PSOF ¶ 23. According to Comcast, Sanford's results from that survey "were some of the lowest in the Call Center." *Id*. ¶ 48. In May 2016, Comcast received two anonymous complaints about Sanford's performance, sent in via the "Comcast Listens" report mechanism. Pl.'s Resp. DSOF ¶ 54; R. 63-14, Def.'s Exh. N, 5/20/16 Comcast Listens Rep. at 1-2 (identifying Sanford as the complainant's supervisor, and stating that it was "unfair for [the complainant] to have to get wrote up for something [Sanford wasn't] doing,"—"call[ing] a customer back."); R. 63-15, Def.'s Exh. O, 5/26/16 Comcast Listens Rep. at 1-2 (similarly blaming Sanford for failing to call customers back); R. 63-16, Def.'s Exh. P, Miller Decl. ¶¶ 3-9 (authenticating the reports and describing the follow-up investigation done on each).

In June 2016, Signore conducted Sanford's mid-year performance evaluation. Pl.'s Resp. DSOF ¶ 56. The evaluation identified multiple problem areas for Sanford and gave him "an overall rating of Needs Improvement." *Id*. ¶ 57; R. 63-9, Def.'s Exh. I, 2016 Perform. Eval. at 14. Sanford's performance deficiencies included failing to follow up with CAEs on statistics that suggested that they were not "following some of the required steps in the customer interaction process" properly. Pl.'s Resp. DSOF ¶ 58. He also was not listening to CAEs' calls as he was required to do, or "issuing corrective actions for CAEs with poor behaviors." *Id*. The 2016 Credo Speak survey

4

was also administered in June 2016. Pl.'s Resp. *Id.* ¶ 60. This time Sanford received a 36.3%, which Comcast characterizes as an "'extremely poor' score." *Id*.

Throughout this process, Sanford met with Signore multiple times. On February 8, 2016, Sanford and Signore met to discuss Sanford's Credo Pulse survey results. Pl.'s Resp. DSOF ¶ 48; Def.'s Resp. PSOF ¶ 25; R. 63-1, Def.'s Exh. A, Sanford Dep. Tr. at 34:5-11; R. 63-2, Def.'s Exh. B, Signore Dep. Tr. at 92:7-18, 93:8-18, 94:6-95:6. According to Sanford, during the meeting, Signore "singled out specific agents indicating that they were disgruntled, longtime, seasoned, and tenured" based on the survey and asked Sanford "to find calls that he could send through to" human resources. Def.'s Resp. PSOF ¶ 25; Sanford Dep. Tr. at 43:11-22, 217:20-219:14; Pl.'s Resp. DSOF ¶ 51 ("At his deposition, Plaintiff testified that Signore allegedly requested during the … meeting that Plaintiff scrutinize the work performance of four CAEs on Plaintiff's team.").

Sanford's argument seems to be that he was instructed to ignore usual protocol in his dealings with those four employees and single them out or scrutinize them particularly harshly. *See* Def.'s Resp. PSOF ¶¶ 25-26 ("[Signore's] directions involved judging over 40 employees []by a different standard rather than the Career Advance Path standard followed nationally by the organization as a whole."); Sanford Dep. Tr. at 43:11-22, 217:20-219:14; 244:23-246:17 ("A. Okay. So why do you believe … you were being asked to follow protocol for one set of employees but not the other set of employees? A. Because they were tenured, unhappy, and probably marked the scores low."); *see also* R. 63-18, Def.'s Exh. R, 8/1/16 Comcast Listens Rep. at 3 ("My training

5

encourages coaching and development based upon a two track predetermined process for conduct or performance."). He was also upset that Signore's selection of the four employees was based, at least in part, on their responses in the Credo Pulse—a survey Sanford had understood to be confidential. *See* Def.'s Exh. R, 8/1/16 Comcast Listens Rep. at 3 ("I was being asked to target certain individuals based on what they may have indicated on a confidential survey.").

Comcast argues in response that "Signore [simply] instructed [Sanford] to listen to phone calls for all his CAEs because that is part of a Supervisor's job duties and Signore wanted to improve the performance of [Sanford's] team of CAEs." Def.'s Resp. PSOF ¶ 26; *see also* Signore Dep. Tr. at 109:1-3 (denying that he asked Sanford to target any employees in particular). Sanford's Rule 56.1 Statement of Facts suggests that he told Signore during the meeting that he would not do exactly what Signore was asking and would instead follow proper (in Sanford's view) protocol for the four singled-out employees. Def.'s Resp. PSOF ¶ 26 ("Plaintiff indicated he would follow Care[e]r Advance protocol, as these agents were performing at the 3.0 to 4.0 level."). But Sanford points to no evidence to establish that point except a Comcast Listens report that he submitted later in 2016 (discussed further below). *See* Def.'s Exh. R, 8/1/16 Comcast Listens Rep. at 3 ("I responded that I had little to no history with the team as a whole and was going to implement the two track performance management model.").

Importantly, the parties agree that Sanford did not raise concerns about age or race discrimination in that meeting. Pl.'s Resp. DSOF ¶ 53 (failing to rebut

6

Comcast's statement that Sanford did not raise race or age during the meeting); Sanford Dep. Tr. at 43:15-45:12, 156:20-157:2, 217:20-219:14 ("Q. So you didn't raise any objection to him that you believed his directive might've constituted age discrimination? A. No, I didn't. Q. Okay, Did you raise any objection to him that that corrective in your opinion constituted some type of race discrimination? A. I—I told him that I was going to follow the protocol.").

After that, Sanford spoke with Brown on the phone on July 1, 2016 and in person on July 5, 2016. Pl.'s Resp. DSOF ¶ 61. The conversations were primarily about Sanford's job performance and his management of his CAE team. *Id.*; Sanford Dep. Tr. at 51:10-55:16. Again, Sanford testified at his deposition that during those conversations he did not raise any concerns about potential discrimination. Pl.'s Resp. DSOF ¶ 61; Sanford Dep. Tr. at 51:21-24 (discussing the July 1 phone call), 162:20-163:8 (discussing the July 5 meeting); R. 63-3, Def.'s Exh. C, Brown Dep. Tr. at 58:9-61:3 (describing Brown's July 5 conversion with Sanford, in which Sanford explained that he disagreed with Signore's approach because he believed corrective action was not warranted for some employees).

On July 8, Sanford met with both Signore and Brown, who placed him on a "60-day performance improvement plan," set to expire on September 13, 2016. Pl.'s Resp. DSOF ¶ 62. Under the plan, Sanford and Signore had weekly coaching sessions on Sanford's "leadership ability, and identifying CAEs' behaviors to coach CAEs to improve" their results. Pl.'s Resp. DSOF ¶ 63. Again, at his deposition, Sanford

7

testified that he did not raise concerns about age or race discrimination at that meeting. Pl.'s Resp. DSOF ¶ 62; Sanford Dep. Tr. at 163:21-164:14.

According to Comcast, Sanford's performance did not improve while he was on the plan. Pl.'s Resp. DSOF ¶ 65. Nevertheless, Signore, Brown, and Lugo decided to extend the plan "to give [Sanford] an additional opportunity to improve his work performance." *Id.* ¶ 66. By early October, when the extension expired, Sanford's team was performing better but he still had not improved his own performance. *Id.* ¶¶ 72-73. So Signore, Brown, and Lugo recommended his termination. *Id.* ¶ 74.

In August, while he was still on the performance improvement plan, Sanford submitted a report of his own to Comcast Listens. Pl.'s Resp. DSOF ¶ 64; Def.'s Exh. R, 8/1/16 Comcast Listens Rep. The initial report reflected Sanford's unhappiness with his conversations with Signore and the fact that he believed he "was being asked to target certain individuals based on what they may have indicated on a confidential survey." Def.'s Exh. R, 8/1/16 Comcast Listens Rep. at 3 ("This bothers me as I know this is wrong in many ways."). He also stated in the report that "things [got] immoral, unethical, and illegal," though it is not exactly clear to what those words refer—perhaps to an issue about whether he should be assigned to sit with his team or not, which he discussed directly after that remark. *Id.* at 2 ("12/8 is my first day back and another supervisor has her things in my pod and her team members are seated. At this point I have no workstation after one had been assigned to me."). Later he again states that Signore was "asking [him] to engage in unethical and illegal behavior," but again that complaint seems to refer to the fact that "the

8

survey [was] completely confidential and employees [were] encouraged to feel safe in this knowledge." *Id.* at 3. Although Sanford clearly reported that he felt uncomfortable about his managers' requests, he did not report discrimination—much less discrimination based specifically on age or race. *Id.* On September 30, Sanford submitted a supplement to the report, recording additional interactions with Signore and Lugo with which he was dissatisfied. *Id.* at 5. Again, the supplement makes no mention of discrimination. *Id.*

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[2] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Protected Activity

Comcast argues that Sanford's ADEA and Title VII retaliation claims must fail because he never engaged in protected activity under either statute. Def.'s Br. at 8-10. Avoiding summary judgment on an ADEA or Title VII retaliation claim requires the plaintiff to show (with the benefit of reasonable inferences) that he "engaged in statutorily protected activity." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (discussing the ADEA); *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008) (discussing Title VII). For a complaint to qualify as protected activity under each statute respectively, it must specifically refer to age discrimination (under the ADEA) or discrimination based on race (or another category covered by Title VII). *Smith*, 674 F.3d at 658 ("In order for Smith's complaints to constitute protected activity, they must include an objection to discrimination on the basis of age.") (citing 29 U.S.C. § 623); *Andonissamy*, 547 F.3d at 850-51 ("While a report of discrimination to a supervisor may be statutorily protected activity under Title VII, the report must include a complaint of national origin discrimination or sufficient facts to raise that inference."). "Merely complaining

10

in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (explaining that the plaintiff's complaint of pay discrimination did not constitute protected activity under Title VII because he did not claim that it resulted from his national origin or membership in any other protected class).

Sanford has entirely failed to establish that he ever complained to anyone at Comcast about race or age discrimination. His response brief points to a few interactions, but none suffice for a jury to find in his favor, even with the benefit of all reasonable inferences. First, he argues that he "explained to Robert Signore that he would follow training rather than discriminate" in their February 8 meeting. R. 73, Pl.'s Resp. at 9. But he provides no evidence—not even his own deposition testimony or an affidavit—that he ever used the term "discriminate" in that conversation, much less that he objected to race- or age-based discrimination. In fact, he admitted in his deposition that he did *not* raise concerns of race or age discrimination during that meeting. Pl.'s Resp. DSOF ¶ 53; Sanford Dep. Tr. at 43:15-45:12, 156:20-157:2, 217:20-219:14.

Even if he had used the term "discrimination" during his meeting with Signore, there is no evidence to suggest that the context of the meeting would have made it clear to Signore that Sanford was referring to *age* or *race* discrimination. Sanford's story is simply that he was uncomfortable singling out the four employees based on their survey submissions and disciplining them outside the normal protocol—not that

11

he was concerned initially about age or race discrimination. And even if he felt that concern subjectively, there is no evidence that he outwardly raised it with Signore or anyone else. Sanford notes that Signore called the employees "seasoned" and "tenured," Pl.'s Resp. DSOF ¶ 49, but Sanford does not claim that he objected to those characterizations or reacted to them in any way. And Seventh Circuit precedent makes clear that references to a person's tenure or career stage are not "inevitable euphemism[s] for old age." *Skiba v. Ill. Ctr. R.R. Co.*, 884 F.3d 708, 722 (7th Cir. 2008) (considering the term "close to retirement.").

The same is true regarding Brown's July 1 and July 5 interactions with Signore. He testified in his deposition that he did not object to race or age discrimination in those conversations, either. Sanford Dep. Tr. at 51:21-24 (discussing the July 1 phone call), 162:20-163:8 (discussing the July 5 meeting). He also admits that he failed to raise those concerns during his July 8 meeting with Signore and Brown. *Id.* at 163:21-164:14.

The other juncture at which Sanford might have objected to discrimination is in his Comcast Listens report. But neither the initial August report nor the September supplement mentions a concern about discrimination—Sanford's concerns in the report have to do with being asked (in his view) to use an improper protocol and being asked to single out employees based on a survey that he understood to be confidential. The word "discrimination" appears in the form questions on the report, but never in Sanford's narrative. And, in fact, the "primary issue type" that Sanford appears to have entered on the form is labeled "Unfair Treatment (*Not*

Discrimination)." Def.'s Exh. R, Comcast Listens Rep. at 1 (emphasis added). Sanford's report does use the terms "wrong" and "illegal," but that type of vague complaint does not pass muster as protected activity under Seventh Circuit precedent. *See Smith*, 674 F.3d at 658; *Andonissamy*, 547 F.3d at 850-51. Sanford may very well have believed that using employees' confidential surveys against them or disciplining some employees differently than others was "wrong" or "illegal." But the fact remains that neither creates an inference of race or age discrimination without more information.

**B. Causation**

In order to prove that Comcast retaliated against him, Sanford must also prove causation, or "that the desire to retaliate was the but-for cause of the challenged employment action." *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (cleaned up); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) ("Under the ADEA retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor.").

Comcast makes two primary arguments on causation. First, Comcast argues that there can be no inference that whatever protected activity Sanford engaged in and his alleged adverse action were related because too much time elapsed between the two. *See* Def.'s Br. at 10-11. As the Seventh Circuit has noted, "[s]uspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich*, 457 F.3d at 665 (cleaned up). And Comcast points to various cases in which courts have held that gaps as short as one to two months may attenuate the timeline enough to make causation

unclear. Def.'s Br. at 11 (citing *Austin v. City of Chi.*, 2018 WL 1508484, *12 (N.D. Ill. March 27, 2018); *Tomanovich*, 457 F.3d at 665; *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 666 (7th Cir. 2011)).

The timeline issue is not as simple as Comcast suggests. The Court's first task under that theory is to pin down exactly what the gap was, which in turns requires identifying the protected activity and adverse actions. Although the Court has already determined that it was *not* protected activity, the Comcast Listens supplement Sanford filed on September 30, 2016 is the last possible protected activity that Sanford could be alleging. Def.'s Exh. R, 8/1/16 Comcast Listens Rep. at 5. The various adverse actions that Sanford identifies in his response brief span from January 7, 2016 through his firing in October 2016. Pl.'s Resp. at 10-12. Comcast argues that the only possible adverse actions were Sanford's performance improvement plan and his firing, Def.'s Br. at 10, but the termination date came less than a month after the Comcast Listens supplement. A gap of less than a month is not so attenuated that it necessarily prevents an inference of causation.

Instead, the real causation problem is encapsulated in Comcast's second argument: Comcast has presented significant evidence of serious problems with Sanford's job performance that both pre- and post-dated any possible protected activity that he has alleged. *See* Def.'s Br. at 11-12. Sanford's 2015 mid-year evaluation by Hilda Toscano was critical on several points, including his supervision of his team. Pl.'s Resp. DSOF ¶ 41; Def.'s Exh. H, 2015 Perform. Eval. at 12-13; Toscano Decl. ¶¶ 1-5. Her year-end evaluation also rated him as "unacceptable" or

14

"needs improvement" in several categories Pl.'s Resp. DSOF ¶¶ 42-43; Def.'s Exh. H, 2015 Performance Eval. at 3, 12. His Credo Speak score in 2015 was likewise poor. Pl.'s Resp. DSOF ¶ 44.

In 2016, the problems continued. Sanford received poor results on the Credo Pulse survey, Pl.'s Resp. DSOF ¶¶ 31, 47-48; Def.'s Resp. PSOF ¶ 23, and the later Credo Speak survey, Pl.'s Resp. DSOF ¶ 60, and his mid-year performance evaluation garnered him an overall rating of "Needs Improvement," Pl.'s Resp. DSOF ¶ 57; Def.'s Exh. I, 2016 Perform. Eval. at 14. During the summer of 2016, Sanford's supervisors placed him on a performance improvement plan, but he failed to improve on the goals identified in that plan. Pl.'s Resp. DSOF ¶¶ 62-63, 65. By the time Sanford was fired, Comcast had built a robust record of problems with his performance, beginning even before he believes he was unfairly asked to target certain employees for discipline. Given the ample evidence of Sanford's poor performance, there is no genuinely disputed issue of fact as to whether any protected activity he might have engaged in was the but-for cause of his termination—it is clear that Comcast acted on valid reasons to fire him.

So ultimately, Sanford has failed to establish evidence of causation, even broadly construing both the protected activity in which he might have engaged and the possible adverse actions he suffered. Because his claims must fail on both the elements of protected activity and causation, the Court need not discuss the range of possible adverse actions.

## IV. Conclusion

For the reasons explained above, Comcast's motion for summary judgment, R. 62, is granted. Final judgment shall be entered. The status hearing of September 5, 2019 is vacated.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 5, 2019